813 So.2d 507 (2002)
Thomas MOORE,
v.
NEW ORLEANS POLICE DEPARTMENT.
No. 2001-CA-0174.
Court of Appeal of Louisiana, Fourth Circuit.
March 7, 2002.
*508 Gary M. Pendergast, New Orleans, LA, for Plaintiff/Appellant.
Mavis S. Early, City Attorney, Brett E. Emmanuel, Assistant City Attorney, Joseph V. DiRosa, Jr., Deputy City Attorney, Franz L. Zibilich, Chief Deputy City Attorney, New Orleans, LA, for Defendant/Appellee.
Court composed of Judge CHARLES R. JONES, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR.
LOVE, Judge.
This appeal is taken from the decision of the Civil Service Commission of the City of New Orleans dismissing Thomas Moore's appeal of his termination from the City of New Orleans Police Department.
For the following reasons, we affirm the decision of the Civil Service Commission.

STATEMENT OF FACTS
Thomas Moore ("Moore") applied to become a member of the City of New Orleans Police Department ("NOPD") in 1998. Moore and Antonio Charles ("Charles") were NOPD recruits who had not yet entered the police academy. Sergeant James Anderson chose Moore and Charles to participate in a sting operation. The operation, conducted by the Public Integrity Division ("PID") of the NOPD was initiated to determine if police officers were harassing African American males in the city. Moore and Charles completed the operation prior to entering the police academy. As a result of the operation, three officers were disciplined-two in the Second District and one in the Eighth District.
Moore and Charles were then released from their assignment and begun preparations to enter the academy. Prior to entering the academy, each candidate is required to undergo a battery of psychiatric tests by the Louisiana State University Behavioral Review Board. Dr. Wayne Greenleaf testified that after the test was administered, the Board determined that Moore was a marginal candidate and that he would need to undergo a clinical interview. After the interview it was determined that Moore was in fact an unsatisfactory candidate to enter the academy. The Board, however, allows an appeals process and Moore underwent two additional psychiatric interviews. Dr. Greenleaf and Dr. Guillermo Urrutia agreed that Moore could enter the academy as a "possible good candidate" requiring periodic assessments by the LSU Behavioral Center.
Moore entered the academy and testified that the first few weeks passed without incident. Moore stated that he "later began to feel that the other recruits were *509 looking at Charles and him kind of strange." According to Moore, the other recruits would not sit with Charles and him and made comments about Moore and Charles being PID "rats." The comments generally came from friends of one of the disciplined officers. Moore and Charles both testified that at the mass prior to graduation, one of the policemen who was disciplined came by to confront them. Immediately following the confrontation Moore reported the incident to Captain Cooke, who asked if Moore had been hurt. When Moore stated that he had not, Captain Cooke told the recruit to let him know if anything else occurred.
Moore was then assigned to the Second District Police Station. His first Field Training Officer ("FTO") was Officer Warren Walker Jr., a nine-year veteran of the police force. Testimony during the civil service hearing demonstrated that Officer Walker was unavailable during most of the first three weeks of Moore's training. Moore was, therefore, placed with several different FTO's to train him in the interim. One of these FTOs testified that he had trained Moore once or twice and had no real problems with Moore. Officer Kenneth Polite testified that he worked with Moore maybe ten times and thought Moore was a good recruit. He did find some problems with Moore's report writing, but felt that Moore was improving.
Moore testified that he immediately began to have problems with Officer Walker. Officer Walker did not appear to be helping him and was rude to him. Officer Walker testified that Moore was difficult to work with because he would not accept criticism and instead blamed Officer Walker for not properly training him. Officer Walker also testified that Moore was always nervous while dealing with suspects, which was dangerous while out in the field. In one incident, Moore was seen visibly shaking while trying to handcuff a suspect.
Moore also felt humiliated by Officer Walker. During one particular incident Officer Walker yelled at Moore in the presence of other people. Officer Walker testified that he yelled at Moore because he had incorrectly completed an incident report. Thus, Officer Walker and Moore had to return to the crime scene to obtain information sufficient to complete the report. Consequently, Officer Walker and Moore were out of service for any other calls for approximately three hours. Officer Walker explained that he felt Moore was not "getting it" when he spoke in a normal tone and thus, he resorted to yelling. Moore reported the yelling incident to Officer Walker's superiors and stated that he believed that Officer Walker had something against him. Even though the rank believed that yelling was an acceptable means of training a new recruit, they transferred Moore to another FTO, Officer Mason Suell. In total, Moore only spent five or six days under Officer Walker's tutelage.
Recruits must undergo a multi-phase process before becoming police officers. Moore was not advanced to phase two of the program because he had to repeat phase one. Moore testified that initially he did not have any problems with Officer Suell during the first two weeks of training. However, Moore testified that eventually Officer Suell's attitude changed because he thought that Moore exhibited substandard report writing and he was often more nervous than was to be expected of a new recruit. Moore also testified that Officer Suell began to have the same attitude as Officer Walker and attributed this to his activities with PID. Both Officer Walker and Officer Suell testified that they had no knowledge of Moore's PID *510 activities until after Moore was no longer with them.
According to Moore, he was sent to see a psychologist by Sergeant Bryant Wininger, the FTO Coordinator, because of the problems with his report writing. However, Dr. Greenleaf testified that Moore was to regularly attend sessions due to his marginal status as a candidate. Moore testified that he was not aware of such a mandate, nor did anyone testify that they informed Moore prior to Officer Wininger's order.
Even though he missed the initial session, Moore attended the sessions after he was told to do so with Dr. Urrutia. Both Moore and Dr. Urrutia testified that Moore did not feel he had any problems requiring help during the first session. Dr. Urrutia instructed Moore to find out why he was there before the next session. Moore stated that he only knew of problems with his report writing. During the third session, Moore confided that he felt that his problems stemmed from his previous involvement with PID and felt that he was the target of retaliation. Dr. Urrutia testified that he then scheduled Moore for a fourth visit, while Moore testified that the doctor released him.
Moore testified that Officer Wininger "flipped" and ordered Moore back to therapy. Officer Wininger testified that after further assessing Moore's problems, he concluded that Moore should not proceed any further in the training program and he relayed this decision to Deputy Chief Ronald Serpas. Consequently, before Moore had the opportunity to return to therapy, he was terminated for "failure to engage in and successfully complete the assigned Behavioral Remediation plan." Soon after, a meeting was held with Chief Serpas, Captain Louis Dabdoub, Captain Bondio, Captain Ursin, Lieutenant Lawrence Weathersby, Dr. Greenleaf, and Dr. Penelope Dralle. During this meeting, Chief Serpas recommended that Moore be terminated. Dr. Greenleaf testified that the panel considered the Chief's recommendation along with the reports from the various FTOs and the psychiatric profiles compiled by the LSU Behavioral Center. The panel also considered Moore's conduct when he was ordered into therapy sessions with Dr. Urrutia. The panel concluded that Moore had not successfully engaged in his remediation and directed his termination. Dr. Greenleaf testified that this meant that Moore had not been fully cooperative with his therapy because he was not self-aware and was unwilling to work on issues that he might have.
Moore appealed his termination to the Civil Service Commission. The Commission held that because Moore was a probationary employee, he was not entitled to an appeal based on Rule II, Section 4.1 of the Civil Service Rules, which requires that a permanent employee be fired solely for cause. The Commission, however, allowed Moore to appeal based on Rule II, Section 10.1, which gives civil service employees a right to appeal determinations based on whistle-blowing activity. The Commission held that even though Moore was not a whistle-blower in the traditional sense, he was engaged in a protected activity covered by the whistle-blower rule. After a three-day hearing, the Commission determined that there was no evidence presented that the knowledge of Moore's undercover activities influenced Moore's supervisors to file reports against him and to criticize his work performance. The Commission determined that Moore's activities as a whistle-blower did not affect his termination.

DISCUSSION
Moore claims that the Commission erred in finding that he failed to establish a *511 prima facie case and concluding that he was terminated for cause.
An appellate court may only review the findings of the Civil Service Commission if it finds that the Commission acted arbitrarily and capriciously. Smith v. New Orleans Police Dept., XXXX-XXXX, p. 7 (La.App. 4 Cir. 4/11/01), 784 So.2d 806, 810. In other words, it must be determined that the Commission abused its discretion because there was no rational basis for the determination. Id. Where there is some evidence to support the finding of the Commission, the appellate court cannot substitute its judgment. Brickman v. New Orleans Aviation Bd., 236 La. 143, 107 So.2d 422, 425 (1958).
Civil Service employees who have reached permanent status cannot be terminated without a lawful cause. Barquet v. Department of Welfare, 620 So.2d 501, 504 (La.App. 4 Cir.1993). See Louisiana Constitution Article X, Sec. 8. However, there is no such guarantee for probationary employees. Nevertheless, all employees have a right not to be subject to discipline based on discrimination. Goins v. Department of Police, 570 So.2d 93, 94 (La.App. 4 Cir.1990). This holds true for discrimination based on whistle-blowing activities. Id. Therefore, Moore could be terminated for any reason other than discrimination based on his whistle-blowing activities.
Generally, the appointing authority has the burden to prove facts alleged on appeal. Goins, 570 So.2d at 94 (citing Civil Service Rule II, Secs. 4.4 & 4.8). However when discrimination is alleged, the burden shifts to the employee. Id. This court in its review of the facts must give great weight to the Commission. Goins, 570 So.2d at 95. Therefore, the Commission's decision that Moore did not prove a prima facie case of discrimination and his termination was justified requires substantial deference. The record reflected that Moore was not terminated due to his whistle-blowing activities. Though there was some conflicting testimony, credibility evaluations cannot be disturbed on review. Barquet, supra. The record demonstrates that several employees of the NOPD believed that Moore had problems that required the behavioral remediation program. The doctors who oversaw the program testified that Moore did not successfully complete the program and refused to actively engage in it. We, therefore, cannot conclude that the Commission committed manifest error when it affirmed Moore's termination.
For the previously stated reasons, we affirm the ruling of the Civil Service Commission.
AFFIRMED
TOBIAS, J., CONCURS.
TOBIAS, J., concurring.
I respectfully concur in the result.
A probationary-status employee may be terminated at any time and for virtually any reason. Dept. of Public Safety & Corr. v. Thornton, 625 So.2d 713 (La. App. 1 Cir. 1993). But the probationary employee must be terminated for true, valid, and real reasons. Id. Our law grants limited appeal rights to probationary employees who allege discrimination. Civ. Serv. Rules §§ 4.5 and 4.6; Mariani v. Police Dept., 96-0871 (La. App. 4 Cir. 12/27/96), 686 So.2d 1012; Walton v. French Market Corp., 94-2457 (La. App. 4 Cir. 4/26/95), 654 So.d 885, 887.
Although Mr. Moore alleges discrimination, I find that the Civil Service Commission was not manifestly erroneous in upholding the appointing authority's determination to discharge Mr. Moore; his termination was not based upon any illegal *512 or inappropriate grounds. Moreover, as this court noted in Stevens v. Department of Police, XXXX-XXXX, p. 8 (La.App. 4 Cir. 5/10/01), 789 So.2d 622, 627, citing Newman v. Department of Fire, 425 So.2d 753 (La.1983), the police department, as a special guardian of the public's safety, has the right to establish appropriate standards for its employees; and the Civil Service Commission is required to give heightened regard to those entities operating as special guardians of the public's safety and operate as a quasimilitary institution where strict discipline is imperative. This heightened regard is especially relevant and material when dealing with probationary employees such as Mr. Moore.